IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CRAIG A. JACKSON
Plaintiff,

vs.                                         Case No.:  3:17cv791/RV/EMT

LEE BROWN, M.D., et al.,
          Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court on Defendants' motions for summary
judgment, with supporting evidentiary materials (ECF Nos. 32, 38, 57, 66, 70).[1]
Plaintiff filed responses in opposition to the motions, with supporting evidentiary
materials (ECF Nos. 78, 80, 81).  Defendant Brown filed an authorized reply (ECF
No. 87).

The case was referred to the undersigned for the issuance of all preliminary
orders and any recommendations to the district court regarding dispositive matters.
*See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P.

---

[1] Defendants Simpson, Melvin, Centurion, and Rummel filed motions to dismiss (ECF
Nos. 32, 38, 57, 70), which the court converted to motions for summary judgment (*see* ECF No.
88).  Defendant Brown filed a motion to dismiss or for summary judgment (ECF No. 66).

72(b).  Upon consideration of the parties' submissions and the relevant law, the undersigned concludes that Defendants' motions should be granted.

## I.    BACKGROUND

Plaintiff Craig A. Jackson ("Jackson"), an inmate of the Florida Department of Corrections ("FDOC") proceeding pro se and in forma pauperis, commenced this case on October 31, 2017, by filing a civil rights complaint under 42 U.S.C. § 1983 (ECF No. 1).  Presently before the court is Jackson's Amended Complaint (ECF No. 7).  Jackson names eight Defendants:  (1) Julie L. Jones, former Secretary of the FDOC, (2) Jimmy Coker, former warden of Santa Rosa Correctional Institution, (3) Centurion of Florida, LLC ("Centurion"), a private medical services provider under contract with the FDOC to provide medical services to FDOC inmates, (4) Dr. Lee Brown, former medical director of Santa Rosa C.I. employed by Corizon Health, a different FDOC medical contractor, (5) Dr. Denis Vilchez, former member of the medical staff at Santa Rosa C.I., (6) Dr. W.D. Rummel, former Chief Health Officer at Santa Rosa C.I. employed by Centurion, (7) Nurse S. Simpson, a nurse at Santa Rosa C.I. employed by Centurion, and (8) Nurse S. Melvin, a nurse at Santa Rosa C.I. employed by Centurion (*see id.* at 1, 3–5).  Jackson claims that Defendants violated his Eighth Amendment rights by exhibiting deliberate indifference to his need for treatment of pain in his left shoulder, left arm, and the left side of his neck

(*id.* at 6–12).  Jackson also brings state law claims of medical negligence/malpractice (*id.*).  Jackson alleges he suffered pain as a result of Defendants' conduct (*id.* at 6).  As relief, he seeks compensatory damages in the amount of $200,000 from each Defendant (*id.* at 12–13).  Jackson also seeks injunctive relief, specifically, an order (1) requiring Defendants to provide an MRI and examination by a neurologist, (2) demoting each Defendant's job position and wages, and (3) requiring Defendants to receive educational training in effective communication skills and "behavior management" (*id.*).

All Defendants were served with process, with the exception of Defendant Vilchez.  The court made extensive efforts to serve Defendant Vilchez, even enlisting the assistance of the FDOC (*see* ECF Nos. 16, 23, 28, 29, 74).  Those efforts have been unsuccessful.

On March 21, 2019, the district court dismissed Jackson's federal claims against Defendants Jones and Coker (ECF No. 86).  The only claims remaining against these Defendants are Jackson's state law negligence claims.

Defendant Nurse Melvin contends Jackson's Eighth Amendment claim is subject to dismissal for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 32).  Nurse Melvin also asserts qualified immunity and Eleventh Amendment immunity with respect to

Jackson's claim for monetary damages (*id.*).  Nurse Melvin further contends 42 U.S.C. § 1997e(e) bars any claims for compensatory and punitive damages (*id.*).

The motions to dismiss filed by Defendants Nurse Simpson and Dr. Rummel argue the same grounds for dismissal as Nurse Melvin, but they additionally contend Jackson failed to satisfy the exhaustion requirement with respect to his federal claims (ECF Nos. 57, 70).

Defendant Centurion seeks dismissal of Jackson's federal claims on grounds of failure to exhaust and failure to state a claim upon which relief may be granted (ECF No. 38).  Centurion contends Jackson's state law negligence claims are subject to dismissal for failure to state a claim and failure to meet statutory conditions precedent (*id.*).

Defendant Brown asserts the same grounds for dismissal as Centurion (ECF No. 66).  However, Dr. Brown submitted evidentiary materials in the form of Jackson's administrative grievances and medical records, which Dr. Brown contends demonstrate no deliberate indifference (*id.*).

Jackson contends he exhausted his administrative remedies with respect to his § 1983 claims, and substantially complied with the statutory requirements for his state negligence claim (ECF Nos. 78, 80, 81).  He further contends his Amended Complaint and supporting evidentiary materials are sufficient to overcome

Defendants' dispositive motions (*id.*).  Jackson submitted copies of administrative grievances and medical records in support of his arguments (*see* ECF No. 81, Exhibits).

Upon converting the motions to dismiss to motions for summary judgment, the court provided the parties an additional opportunity to submit supporting evidentiary materials (*see* ECF Nos. 82, 88, 90, 104).  As of the date of this Report and Recommendation, none of the parties have submitted additional evidentiary materials.

II.   DISCUSSION

A.   <u>Summary Judgment Standard</u>

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See Celotex Corp.*, *supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory

answers or other materials on file designate specific facts showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>> . . . .
> **(4) Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).

Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed. "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the

matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)).  If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment or grant summary judgment if the moving party's motion and supporting materials— including the facts considered undisputed—show that the moving party is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Jones v. Cannon*, 174 F. 3d 1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See Celotex Corp.*, 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

    B.   <u>Material Facts</u>

As this case comes before the court on Defendants' motions for summary judgment, the court is required to view the facts in the light most favorable to Jackson, the nonmoving party.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  The court does so here, referring to Jackson's verified Amended Complaint, and taking those facts from the parties' pleadings and summary judgment materials of record.  *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint must be considered in opposition to summary judgment); Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F).  Matters stated below as "facts" for purposes of summary judgment may not be the actual facts.  *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

Upon Jackson's arrival at Santa Rosa C.I. in April of 2015, he received a baseline evaluation by a doctor for neurology, cardiovascular, and endocrine conditions (this doctor is not a named Defendant) (Jackson's medical records, ECF No. 65-1 at 11–13, 35–44).  Jackson reported being treated for seizures, high blood

pressure, diabetes, and high cholesterol (*id.*).  Jackson also reported he received "brain surgery" and pelvic surgery following a car accident in 1997 (*id.*).  Jackson's initial physical examination revealed limitation of flexion and extension of Jackson's right elbow and a surgical scar on his right elbow (*id.* at 37).  Jackson was diagnosed with hypertension (high blood pressure), Type 2 diabetes, hyperlipidemia (high cholesterol), and seizures (*id.*).

On May 14, 2015, Jackson submitted a sick call request regarding the following:  (1) "need extra mattress pad," (2) sinus medication, (3) pain medication due to degenerative arthritis, and (4) dandruff shampoo (dry and flaky scalp and skin) (Jackson's medical records, ECF No. 65-1 at 105).  The next day, on May 15, 2015, Jackson was seen by a nurse (who is not a named Defendant) (*id.* at 103–04, 106).  Jackson complained of back pain on the left and right sides of his lumbar and sacral regions, which sometimes radiated to his legs (*id.*).  Jackson reported his pain level as 4–5 on a scale of 1 to 10 (10 being the most severe level of pain) (*id.*).  Jackson did not report pain in his neck, left arm, or left shoulder (*see id.*).  Jackson reported that Naproxen decreased or relieved the pain in his back (*id.*).  The same day, the nurse referred Jackson's chart to Dr. Brown for a prescription (*id.* at 103–04, 122).  Also the same day, Dr. Brown prescribed Naproxen 500 mg. twice daily

for Jackson's complaint of back pain (*id.* at 122).  Dr. Brown also prescribed Claritin and dandruff shampoo (*id.*).

On June 21, 2015, Jackson submitted a sick call request regarding the following:  (1) psoriasis on face, head, chest, and back, (2) pain in right elbow, (3) pain in neck, (4) "need hat pass," and (5) dry skin (Jackson's medical records, ECF No. 65-1 at 100).  Jackson was seen by ARNP Szalai (who is not a named Defendant) (*id.* at 95–99, 101).  Jackson complained of dry skin, and a lump on the side of his neck which "comes and goes" (*id.* at 101).  Jackson stated he wanted a "hat pass" because he "can't stand heat" (*id.*).  ARNP Szalai did not observe anything on Jackson's neck, and assessed the reported lump as a subaceous cyst that did not require treatment (*id.*).

On July 22, 2015, Dr. Brown saw Jackson for his chronic conditions (high blood pressure, diabetes, seizures, high cholesterol, and psoriasis) and a report of Jackson's most recent blood work, which indicated anemia (Jackson's medical records, ECF No. 65-1 at 93–94, 119, 161–64).  Dr. Brown prescribed an iron supplement (*id.* at 93, 119).

On August 5, 2015, Dr. Brown saw Jackson for a follow-up regarding his anemia and a head cold (Jackson's medical records, ECF No. 65-1 at 92).  Dr. Brown issued saline nasal spray and continued the iron supplement (*id.*).

On August 19, 2015, Dr. Brown saw Jackson for a follow-up regarding his anemia (Jackson's medical records, ECF No. 65-1 at 91).  Dr. Brown ordered blood work in two months (*id.* at 91, 118).

On October 21, 2015, Director of Nursing L. Clark and ARNP Szalai (neither of whom are named Defendants) decreased Jackson's Naproxen from 500 mg. to 375 mg. twice daily, and also ordered x-rays of Jackson's left shoulder and right elbow (Jackson's medical records, ECF No. 65-1 at 118).  ARNP Szalai also ordered a housing assignment to a low bunk on a low tier and work restrictions due to Jackson's history of seizures, including no work around steam, electricity, fire, chemicals, machinery, heights, or any other dangerous situation (*id.* at 22).

Jackson received the x-rays of his left shoulder and right elbow on October 28, 2015 (Jackson's medical records, ECF No. 65-1 at 173–74).  The Radiology Report of Jackson's left shoulder indicated the following:

> **Findings**:  Multiple views of the left shoulder demonstrate no fracture, dislocation, or subluxation.  Mild degenerative changes of the glenohumeral joint  All cortical margins are intact, and the soft tissue planes are normal.
>
> **IMPRESSION**:  Mild degenerative changes of the glenohumeral joint.  No acute osseous abnormality.
>
> **Recommendation**:  Follow up as clinically indicated.

(Jackson's medical records, ECF No. 65-1 at 174; ECF No. 81 at 29).

The Radiology Report of Jackson's right elbow indicated the following:

**Findings**: There appears to be complete fusion of the ulnohumeral joint and marked narrowing of the radiohumeral joint.  No acute fracture or dislocation is identified. No joint effusion.  No suspicious osseous lesion.

**IMPRESSION**: Complete fusion of the ulnohumeral joint and marked narrowing of the radiohumeral joint.  No acute fracture demonstrated.

**Recommendation**:  Follow up as clinically indicated.

(Jackson's medical records, ECF No. 65-1 at 173; ECF No. 81 at 29).  ARNP Szalai reviewed both reports on November 4, 2015 (*id.*, ECF No. 81 at 29, 30).

On November 12, 2015, Dr. Brown prescribed medication for Jackson's seizures and allergies (Jackson's medical records, ECF No. 65-1 at 117).   On November 20, 2015, Dr. Brown issued Jackson medical passes for an extra blanket, long johns, front cuffs, and shoe insoles for flat feet (Jackson's medical records, ECF No. 65-1 at 21, 76, 116; ECF No. 81 at 34).

On December 9, 2015, Jackson submitted a sick call request for the following: (1) never received long johns, (2) eyeglasses need repair, (3) itching between legs, (4) need arch support, (5) need pass for no prolonged standing due to severe back problem, and (6) need sinus medications renewed (Jackson's medical records, ECF No. 65-1 at 85).  Jackson was seen by Nurse Simpson on December 10 or 11, 2015 (*id.* at 84–89).  With respect to his "back problem," Jackson complained of pain in

his back/hips (*id.* at 89).  He reported that the pain did not radiate (*id.*).  Jackson reported his pain level as 5–6 (*id.*).  Nurse Simpson noted that Jackson's ears and lungs were clear, and there was no nasal drainage (*id.*).  Nurse Simpson repaired Jackson's eyeglasses, provided cream/powder for the itching, and referred Jackson's chart to Dr. Brown for a possible prescription for Claritin (*id.*).  Dr. Brown reviewed Jackson's chart on December 16, 2015 (*id.* at 86–89).

On January 13, 2016, Jackson submitted a sick call request for the following: (1) treatment for sinus problem, (2) eyeglasses need repair, (3) treatment for fungus in toes, (4) ointment/treatment for scalp, face, and chest, (5) arch support not working, (6) need cold medication, and (7) need hat pass (Jackson's medical records, ECF No. 65-1 at 82).  Jackson was seen by a nurse the next day, who referred Jackson's chart to Dr. Brown (*id.* at 76).

Dr. Brown saw Jackson on January 19, 2016 (Jackson's medical records, ECF No. 65-1 at 76).  Jackson reported episodes of low blood sugar and requested a refill of Clotrimazole to treat his skin rash (*id.*).  Jackson also reported that Naproxen helped with his joint pain, and Claritin helped with his allergies (*id.*).  Dr. Brown continued Jackson's prescription for Naproxen and Claritin, prescribed medication for Jackson's skin rash, and ordered a 2,800 calorie/day diet (*id.* at 76, 116).

On April 15, 2016, Jackson was transferred to the Pinellas County Jail (*see* Amended Complaint, ECF No. 7 at 8; *see also* Jackson's medical records, ECF No. 65-1 at 69). Jackson questioned the jail's medical staff about "agonizing pain" (*id.*). According to Jackson, the nursing staff suggested he may be suffering from a pinched nerve and advised Jackson to request an MRI when he returned to the FDOC (*id.*).

Jackson returned to Santa Rosa C.I. in June of 2016 (Amended Complaint, ECF No. 7 at 8). Jackson alleges he was seen by Nurse Simpson prior to a visit with Dr. Vilchez on June 17 (Amended Complaint, ECF No. 7 at 8). Jackson alleges he questioned Nurse Simpson about an MRI, and told Simpson that the jail's medical staff suggested he may be suffering from a pinched nerve (*id.*). Jackson alleges Nurse Simpson responded that no one at Santa Rosa C.I. cared about what the jail medical staff said (*id.*). Jackson was seen by Dr. Vilchez on June 17, during his Chronic Illness Clinic appointment (*see* Amended Complaint, ECF No. 7 at 8; *see also* Jackson's grievance and Dr. Rummel's Response (in which he cited Plaintiff's medical records), ECF No. 81 at 13–14). Dr. Vilchez prescribed medications for Jackson's chronic conditions (diabetes, seizures, high blood pressure, and high cholesterol) (*see* Dr. Rummel's Response to Jackson's grievance, ECF No. 81 at 13; Jackson's medical records, ECF No. 65-1 at 115). Dr. Vilchez also issued a medical

pass for a low bunk, a low tier, no lifting or pushing over 15 pounds, and no work around dangerous situations (due to Jackson's history of seizures) (Jackson's medical records, ECF No. 81 at 34). On June 20 or 29, 2016, Jackson went to sick call for complaints of pain (*see* Jackson's Grievance and Dr. Rummel's Response, ECF No. 81 at 13–14). Nurse Simpson referred Jackson's chart to a physician, and the physician prescribed Naproxen for pain on July 5, 2016 (*see* Dr. Rummel's Response to Jackson's grievance, ECF No. 81 at 13; Jackson's Grievance appeal, ECF No. 81 at 12).

Jackson states he saw Dr. Vilchez for complaints of pain during the first two weeks of September, and questioned Dr. Vilchez about an MRI (*see* Amended Complaint, ECF No. 7 at 8–9; *see also* Jackson's Grievance, ECF No. 81 at 16). Dr. Vilchez ordered x-rays of Jackson's left arm, shoulder, and neck (Jackson's medical records, ECF No. 81 at 31). Jackson alleges Dr. Vilchez advised him that he would submit a request for an MRI (*see* Jackson's Grievance, ECF No. 81 at 18). Jackson alleges Dr. Vilchez also issued a medical pass which included restricted activity, front handcuffs, an extra blanket, and an "ADA bed" (Amended Complaint, ECF No. 7 at 8). Jackson alleges he was moved from his assigned bed M-2150 single, to bed M-2125 single, which Jackson describes as an "ADA bed" (*id.* at 8–9).

Jackson received the x-ray on September 14, 2016 (Jackson's medical records, ECF No. 81 at 31).  The Radiology Interpretation indicated the following:

> **C-SPINE 2V:**
> AP and lateral views of the cervical spine were acquired.  No fracture is seen in the cervical spine.  The intervertebral disc space heights appear preserved.  There is mild endplate remodeling at C6–C7.
>
> **IMPRESSION:**
> **No fracture is seen in the cervical spine.**
>
> **SHOULDER LT 2V:**
> AP views of the left shoulder were acquired in internal and external rotation, demonstrate [sic] no fracture or malalignment left shoulder. The glenohumeral and coracoclavicular joints are normally located.
>
> **IMPRESSION**:
> **The left shoulder appears intact.**

(Jackson's medical records, ECF No. 81 at 31).

On September 15, 2016, Nurse Melvin reviewed the x-ray report (Jackson's medical records, ECF No. 81 at 31).  The same day, Nurse Melvin issued a medical pass for no lifting, pushing, or pulling over 15 pounds, no work around dangerous situations (due to Jackson's history of seizures), a low bunk, and a low tier (*id.* at 34).  Nurse Melvin's medical pass included the same restrictions as the medical pass issued by Dr. Vilchez on June 17, 2016 (*see id.*).  On September 18 or 19, Nurse Simpson summoned Jackson to the medical department and informed him that the results of the x-rays indicated no abnormalities (Amended Complaint, ECF No. 7 at

8–10).  Nurse Simpson accused Jackson of malingering, but Jackson explained that an x-ray would not reveal a problem with a nerve (*id.* at 10).  Jackson alleges Nurse Simpson took the medical pass issued by Dr. Vilchez earlier that month (September) and provided Jackson with the medical pass issued by Nurse Melvin on September 15 (which included the same restrictions as the medical pass issued by Dr. Vilchez on June 17, 2016, i.e., no lifting, pushing, or pulling over 15 pounds, no work around dangerous situations, a low bunk, and a low tier, but did not authorize an "ADA bed") (*id.* at 8–9).  Jackson alleges he was moved from the cell with an "ADA bed" to a cell with a "regular bed" (*id.* at 9).  On September 20, 2016, Dr. Vilchez reviewed the x-ray report (Jackson's medical records, ECF No. 81 at 31).

On October 11, 2016, Nurse Melvin issued another medical pass for no work or lifting with the right arm, and front cuffs (Jackson's  medical records, ECF No. 81 at 35).

Jackson alleges on October 21, 2016, he was seen by Nurse Simpson for a complaint of a lump or knot on his left shoulder (*see* Amended Complaint, ECF No. 7 at 10; *see also* Jackson's Grievance, ECF No. 81 at 18).  Jackson alleges Nurse Simpson stated she did not see a lump on his shoulder (*id.*).  Jackson alleges he asked Nurse Simpson to feel the lump, but she refused (*id.*).  Jackson states Nurse Simpson told him that Dr. Vilchez ordered an MRI (Jackson's Grievance, ECF No. 81 at 18).

On November 16, 2016, Dr. Rummel notified Jackson that Dr. Vilchez had submitted a consultation request, and that the consultation would be scheduled "in the near future" (Dr. Rummel's Response to Jackson's Grievance, ECF No. 81 at 19).

A consultation request was submitted on November 28, 2016, by Dr. Rummel (Jackson's medical records, ECF No. 81 at 32). Dr. Rummel requested an evaluation and recommendation by a physical therapist for a diagnosis and treatment plan for Jackson's left shoulder pain and limited range of motion in his left arm   Dr. Rummel indicated that the consultation was "urgent," and provided the following history and findings:

> 53 y/o B/M with 1 year Hx [history of] job related injury to <u>left</u> shoulder [with] pain, [decreased] ROM & numbness & weakness distally to <u>left</u> extremity. X rays negative for boney abnormality. This [patient] would benefit from MRI to better understand injury to soft tissue of L shoulder & C-spine and arm.  This is <u>unrelated</u> to <u>right</u> upper extremity injury from M[otor] V[ehicle] A[ccident] in 1997, a stable condition.  Pt. seeks help for the <u>left</u> shoulder/arm, his good arm.  (No question of adhesive capsulitis here.)

(Jackson's medical records, ECF No. 81 at 32) (emphasis in original). Dr. Rummel's provisional diagnosis was "left shoulder pain with no lateral elevation in L arm" (*id.*).

In December of 2016, a member of Jackson's family contacted the prison and complained that Jackson was not receiving adequate medical treatment for his pain (Amended Complaint, ECF No. 7 at 10).   Jackson was seen by a doctor, who Jackson believes was Dr. Rummel (*id.*).   The doctor allegedly explained that Jackson's medical records indicated he already should have been transferred to the Reception and Medical Center for the consultation with a specialist (*id.*).   The doctor allegedly explained that Dr. Vilchez attempted to effect the transfer, but "someone else" on the medical staff had "done things to cause a block" (*see* Complaint, ECF No. 1 at 9–10).   The doctor allegedly assured Jackson that everything would be done to ensure that he was transferred to the RMC (Reception and Medical Center of the FDOC) "very soon" (Amended Complaint, ECF No. 7 at 10).

On December 14, 2016, Jackson arrived at RMC (Amended Complaint, ECF No. 7 at 10–11).   Jackson was examined by a physical therapist on December 20, 2016 (*id.* at 11).   The physical therapist's findings, as documented in the physical therapist's Report, were the following:

> **Findings**:  R handed BM, but he has to use L u[pper] e[xtremity] due to R u[pper] e[xtremity] injury.
>
> Posture:  W[ithin] N[ormal] L[imits].  L u[pper] e[tremity] pain–spasm. R u[pper] e[xtremity] elbow contracture since 1977.
>
> ROM:  L Sh Flex[ion] 3-/5; Abd[uction] 3-/5; E[xternal rotation] 3-/5

Ext[ension] 2/5; Add[uction] 2/5; I[nternal rotation] 3-/5

Strength:  L Sh      Flex-Abd-ER = 80°, 80°, 60°
                     Ext Add-IR = 20°, 10°, 50°

Adl's [activities of daily living]:  L Sh pain, stiffness with dressing, bathing, grooming, reaching.  + impingement, tendonitis L Sh.

HEP [home exercise program]:  Pendulum Ex[tensions] L u[pper] e[tremity] x 10 reps, Flex AA ROM, Sh ER AROM, hands on hips stretch, 2x/day, daily.

(Jackson's medical records, ECF No. 81 at 33).    The physical therapist recommended physical therapy twice a week for four weeks, with the goals of (1) decreasing pain during activities of daily living by 25–50%, and (2) improving range of motion during activities of daily living by 25–50% (*id.*).

Jackson states he started physical therapy on February 14, 2017 (Amended Complaint, ECF No. 7  at 11).  Jackson states that on March 7, 2017, after three weeks of therapy, he refused additional therapy, because he continued to experience pain, and neither the therapist nor the doctor provided pain medication (*id.*).  The same day, Jackson was provided a 15-day supply of pain medication (*id.*).

Jackson returned to Santa Rosa C.I. on or about May 2, 2017 (*see* Jackson's Grievance, ECF No. 81 at 24).  On May 4, 2017, Nurse Melvin issued a medical pass for front cuffs, a low bunk, a low tier, no working or lifting with right arm, and no working around dangerous situations (Jackson's medical records, ECF No. 81 at

35).  On May 8, 2017, Jackson was seen by Nurse Melvin at a Chronic Illness Clinic (*see* Jackson's Grievance, ECF No. 81 at 24).  Jackson requested an "ADA bed" and an "ADA locker," but Nurse Melvin responded that he did not meet the criteria for either (*id.*).  Jackson filed a grievance concerning this issue, and Dr. Ramos (who is not a named Defendant) affirmed Nurse Melvin's determination that Jackson did not meet the criteria for an ADA bed or locker (*id.* at 35–36).

   C.   Eighth Amendment Claims

   When brought by convicted prisoners, claims of deliberate indifference to serious medical needs proceed under the Cruel and Unusual Punishment Clause of the Eighth Amendment.  *See Gilmore v. Hodges*, 738 F.3d 266, 271 (11th Cir. 2013).  Stating a claim of inadequate medical treatment requires satisfying two minima (from which the case law has ultimately derived four requirements).  First, there must be, objectively speaking, conduct by public officials "sufficiently serious" to constitute a cruel or unusual deprivation—one "denying 'the minimal civilized measure of life's necessities.'"  *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)).  Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish.  *See Wilson*, 501 U.S. at 300 ("The source of the intent requirement is not the

predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual punishment.   If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (emphases in original)).

In the context of denial of medical treatment, each of these minima has been more specifically described as encompassing two subsidiary requirements.  To show an objectively serious deprivation, it is necessary to demonstrate, first, an objectively "serious medical need[ ]," *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), one that, if left unattended, "pos[es] a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  Second, it is necessary to demonstrate that the response made by the public official to that need was poor enough to constitute "an unnecessary and wanton infliction of pain," and not merely accidental inadequacy, "negligen[ce] in diagnosi[s] or treat[ment]," or even "[m]edical malpractice" actionable under state law, *Estelle*, 429 U.S. at 105–06.  Conduct that is more than merely negligent includes:  "(1) grossly inadequate care; (2) a decision to take an easier but less

efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011).

To show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of "deliberate indifference," *Estelle*, 429 U.S. at 105, which is in turn defined as requiring two separate things: "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [ ] and . . . draw[ing of] the inference," *Farmer*, 511 U.S. at 837.

In the prison context, the court must "distinguish between evidence of disputed facts and disputed matters of professional judgment." *Beard v. Banks*, 548 U.S. 521, 530, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006). A medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment. *See Estelle*, 429 U.S. at 107–08. "Where a prisoner has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." *Hamm v. Dekalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted). Further, a mere disagreement between an inmate and the prison's medical staff as to the course of treatment does not establish deliberate

indifference.  *See Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citations omitted).

Here, viewing the evidence in the light most favorable to Jackson, Defendants were not deliberately indifferent to a serious medical need.  Jackson alleges in his Amended Complaint that "after repeatedly going to sick-call and medical call-outs for the rigorous and intense pain in the left side of the plaintiff's neck, left shoulder, and left arm," he was finally seen by Dr. Brown in October of 2015 (Amended Complaint, ECF No. 7 at 7 (emphasis added)).  But Jackson's medical records, sick call requests, and grievances demonstrate that October of 2015 was the first time Jackson reported this particular pain (i.e., pain in his left shoulder, left arm, and left side of his neck).  Jackson's medical records demonstrate that an ARNP promptly addressed his complaint by ordering an x-ray of his left shoulder.  The x-ray, which Jackson received within two weeks, indicated only mild degenerative changes of the glenohumeral joint, with no acute bone abnormality.

The next time Jackson complained of pain in his left shoulder, arm, and neck was in June of 2016, when he spoke to Nurse Simpson at sick call.  Jackson alleges he told Nurse Simpson that the medical staff at the Pinellas County Jail had speculated he may be suffering from a pinched nerve, and they suggested he request an MRI.  Nurse Simpson allegedly responded that the medical staff at Santa Rosa

C.I. did not care what the medical staff at the jail said.  But the record demonstrates that this was not Nurse Simpson's only response.  Nurse Simpson also referred Jackson's chart to a clinician, and the clinician prescribed a pain reliever, Naproxen. Nurse Simpson's response to Jackson's complaint of pain was not objectively unreasonable.

Jackson next discussed the issue of pain in his left shoulder, arm, and neck three months later, in September of 2016, when he was seen by Dr. Vilchez.  Dr. Vilchez responded to Jackson's complaints by ordering x-rays of Jackson's left shoulder, arm, and neck.  Jackson states Dr. Vilchez advised him that he would submit a consultation request for an MRI.  Dr. Rummel verified, in response to one of Jackson's grievances, that Dr. Vilchez submitted a consultation request.  A consultation request, which included a suggestion for an MRI, was not actually processed until November 28, 2016, and within two (2) weeks of that date, Jackson was transferred to the Reception and Medical Center.  There is no evidence that the delay in the submission or processing of the consultation request was caused by any named Defendant, let alone that it was caused by any Defendant's deliberate indifference, as opposed to mere negligence.  The specialist at the Reception and Medical Center diagnosed Jackson's condition as impingement and tendonitis, and recommended physical therapy.  Jackson received several sessions of physical

therapy, but refused to complete the entire recommended treatment plan.   Upon

Jackson's refusal, he was again prescribed pain medication.

Jackson obviously disagrees with the diagnostic tools utilized by Defendants,

the diagnosis he received from the specialist, and the recommended treatment, but

his disagreement does not establish deliberate indifference on the part of any

Defendant.  *See Estelle*, 429 U.S. at 107 (recognizing that the plaintiff's primary

claim was that "more should have been done" to diagnose and treat a back injury,

and explaining, "[a] medical decision not to order an X-ray, or like measures, does

not represent cruel and unusual punishment.  At most it is medical malpractice.");

*Harris*, 941 F.2d at 1505 (a simple difference in medical opinion between the

prison's medical staff and the inmate as to the latter's diagnosis or course of

treatment does not support a claim of cruel and unusual punishment).

Jackson has failed to demonstrate a genuine issue of material fact as to

whether any Defendant was deliberately indifferent to a serious medical need with

respect to the pain in his left shoulder, left arm, and left side of his neck.  Based upon

the undisputed material facts, Defendants are entitled to judgment in their favor on

Jackson's Eighth Amendment claims.

D.     State Law Medical Negligence/Malpractice Claims[2]

Jackson's claims of negligence and medical malpractice arise out of the rendering of, or failure to render, medical care or services; therefore, the claims are subject to the pre-suit requirements of Florida's Medical Malpractice Act, contained in Chapter 766, Florida Statutes.  *See* Fla. Stat. §§ 766.106(1)–(2), 766.202(6); *see also Kukral v. Mekras*, 679 So. 2d 278, 280 (Fla. 1996); *J.B. v. Sacred Heart Hosp. of Pensacola*, 635 So. 2d 945, 949 (Fla. 1994); *Shands Jacksonville Med. Ctr., Inc. v. Pusha*, 254 So. 3d 1076, 1081 (Fla. 1st DCA 2018) (citation omitted).  These statutory requirements include, but are not limited to, (1) conducting a pre-suit investigation, (2) notifying each prospective defendant of the intent to initiate litigation for medical negligence, (3) notifying the Department of Health by certified mail, return receipt requested, of an intent to initiate litigation for medical malpractice if any prospective defendant is a health care provider licensed under Florida Statutes Chapter 458–61 or Chapter 466, and (4) submitting, to each prospective defendant at the time the notice of intent is mailed, a verified written

---

[2] Although Defendants Jones, Coker, Melvin, and Simpson do not address Jackson's state law medical negligence/malpractice claims, which Jackson appears to assert as to all Defendants (*see* ECF No. 7 at 6), the court may nevertheless dismiss the claims if Jackson's allegations fail to state a claim upon which relief may be granted.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii); 28 U.S.C. § 1915A(b)(1).

medical expert opinion which corroborates the existence of reasonable grounds to initiate the litigation.  *See* Fla. Stat. §§ 766.104, 766.106, 766.203(2).  The pre-suit requirements apply to incarcerated plaintiffs.  *See O'Hanrahan v. Moore*, 731 So. 2d 95 (Fla. 4th DCA 1999); *Okaloosa Cnty. v. Custer*, 697 So. 2d 1297 (Fla. 1st DCA 1997).  Further, the statutory requirements also apply to cases filed in federal court.  *See McMahan v. Toto*, 256 F.3d 1120 (11th Cir. 2001); *Woods v. Holy Cross Hosp.*, 591 F.2d 1164 (5th Cir. 1979); *Clark v. Sarasota Cnty. Pub. Hosp. Bd.*, 65 F. Supp. 2d 1308, 1314 (M.D. Fla. 1998).

Defendants argue Jackson failed to satisfy any of these pre-suit conditions (*see* ECF No. 38 at 7; ECF No. 66 at 13–15).  Jackson alleges he satisfied the pre-suit notice requirements by filing administrative grievances (*see* ECF No. 80 at 2). He further alleges he satisfied the requirement of providing Defendants a verified written medical expert opinion by "referenc[ing] an outside medical opinion" in the Statement of Facts section of his Amended Complaint (ECF No. 78 at 3–4; ECF No. 80 at 2–3).

To the extent Jackson is referencing the alleged opinions of the medical staff at the Pinellas County Jail (who allegedly speculated that Jackson may be suffering from a pinched nerve, and advised him to request an MRI when he returned to the FDOC), Jackson has not alleged, or shown, that any of these alleged opinions were

in writing or verified.  Additionally, to the extent Jackson is referencing the opinion of the physical therapist at the Reception and Medical Center, the only written opinion of that expert is the physical therapist's Report, which diagnosed Jackson's condition as impingement and tendonitis in his left shoulder and recommended physical therapy, which Jackson received.  The physical therapist's Report does not corroborate the existence of reasonable grounds to initiate a medical negligence/malpractice suit.

Jackson failed to comply with Florida's statutory preconditions to filing a medical negligence/malpractice suit against any Defendant.  Therefore, his state law claims should be dismissed with prejudice.

III.   CONCLUSION

There is no genuine issue of material fact for trial, and considering the material facts in the light most favorable to Jackson, none of the Defendants exhibited deliberate indifference to a serious medical need.  Therefore, Defendants Simpson, Melvin, Rummel, Brown, and Centurion are entitled to summary judgment in their favor on Jackson's Eighth Amendment claims.  Additionally, Jackson's state law claims against all Defendants should be dismissed for Jackson's failure to satisfy the statutory prerequisites for bringing a medical negligence/malpractice claim against any Defendant.  As a final note, even though Dr. Vilchez has not been served with

process (despite the court's making reasonable to do so), it is plain that Jackson cannot state a federal or state claim against Dr. Vilchez for the reasons discussed in this Report and Recommendation.  Accordingly, Jackson's claims against Dr. Vilchez are also subject to dismissal.  *See Loman Dev. Co. v. Daytona Hotel and Motel Suppliers, Inc.*, 817 F.2d 1533, 1537 (11th Cir. 1987) ("A District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related.") (internal quotation marks and citation omitted).

Accordingly, it is respectfully **RECOMMENDED**:

That Defendants' motions for summary judgment (ECF Nos. 32, 38, 57, 66, 70) be **GRANTED**, and judgment entered in favor of Defendants and against Plaintiff.

At Pensacola, Florida this 19th day of July 2019.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


Case No.:  3:17cv791/RV/EMT

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.